# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION
#### Case No. _____

| | |
|---|---|
| BRENDA ATKINSON, | ) |
| JAMES ATKINSON, | ) |
| ANNA MORRISEY, | ) |
| SALISA BEST, | ) |
| KATIE MORRISEY BRUNSON, | ) |
| GLENN FAISON, and | ) |
| ELAINE FAISON HUNT, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MURPHY-BROWN, LLC, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiffs hereby file their Complaint against the Defendant Murphy-Brown, LLC and allege as follows:

## I. INTRODUCTION

1. The Plaintiffs are residents of Duplin County. During the pertinent times they have resided in close proximity to tens of thousands of hogs owned by the Defendant kept in one or more Concentrated Animal Feeding Operations ("CAFOs"). They include William S. Matthews farm to the northeast, NBH Finishers #42 to the northwest, and H&C Farm to the southeast holding collectively thousands of Defendant's hogs.

2. Hogs generate multiple times more manure than humans. Defendant's hogs at the CAFO facilities generate many times more sewage than entire towns. Yet Defendant has failed to take adequate steps to manage the number of hogs or otherwise take appropriate steps to

1

eliminate the obnoxious recurrent odors and other causes of nuisance. The hogs have impaired the Plaintiffs' use and enjoyment of their properties.

3.     The presence of Defendant's hogs has caused periodic swarms of flies and other pests. Large flies periodically descend upon Plaintiffs' property, interfering with activities. The flies get stuck to windows and get inside the home. These insects are "vectors" for disease.

4.     Defendant's hogs necessitate large trucks crawling up and down the streets outside of the Plaintiffs' homes. The relatively narrow country roads normally would never be subjected to having repeated episodes of large tractor-trailers and other big trucks taking feed to the hogs, trucking in live hogs, and trucking out live and dead hogs. These trucks often go by in the dead of night; they cause noise, dust, and liquid to spill from the trucks. The bright lights shine from their headlights. They are the opposite of what one would expect to see going by one's home in a rural country neighborhood.

5.     Defendant is a large enterprise with the ability and the resources to end the nuisance. Defendant's parent company Smithfield Foods, Inc. ("Smithfield") was sold to a Chinese-backed multinational corporation, Shuanghui, in late 2013 in a transaction estimated to have a value in excess of $7 billion, and reported record profits for the first quarter of 2014. Smithfield reported sales for the first quarter of 2014 of $3.4 billion and net income of $105.3 million. Defendant clearly has the resources to abate the nuisance yet has not done so.

## II.  PARTIES

### A.     Plaintiffs.

6.     Plaintiff **Brenda Atkinson** is a resident of North Carolina who resides at 7235 Old Warsaw Road in Turkey, Sampson County, North Carolina.

2

7.     Plaintiff **James Atkinson** is a resident of North Carolina who resides at 7235 Old Warsaw Road in Turkey, Sampson County, North Carolina.

8.     Plaintiff **Anna Morrisey** is a resident of North Carolina who resides at 7235 Old Warsaw Road in Turkey, Sampson County, North Carolina.

9.     Plaintiff **Salisa Best** is a resident of North Carolina who resides at 7235 Old Warsaw Road in Turkey, Sampson County, North Carolina.

10.    Plaintiff **Katie Morrisey Brunson** is a resident of North Carolina who resides at 7930 Old Warsaw Road in Turkey, Sampson County, North Carolina.

11.    Plaintiff **Glenn Faison** is a resident of North Carolina who resides at 7161 Old Warsaw Road in Turkey, Sampson County, North Carolina.

12.    Plaintiff **Elaine Faison Hunt** is a resident of North Carolina who resides at 7171 Old Warsaw Road in Turkey, Sampson County, North Carolina.

**B.      Defendant**

13.    Defendant **Murphy-Brown, LLC**, is a limited liability company organized under the law of Delaware.  Defendant's sole member is John Morrell & Company ("Morrell"), a corporation incorporated under the law of Delaware and with its principal office located at 200 Commerce Street, Smithfield, VA 23430.  Morrell is wholly-owned subsidiary of Smithfield, a corporation incorporated under the law of Virginia and with its principal office located at the same address as Morrell.  During the pertinent times, Defendant has conducted business in numerous states including North Carolina.

## III.  JURISDICTION AND VENUE

14.    The Court has personal jurisdiction pursuant to N.C. Gen. Stat. § 1-75.4.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that this is a district in which a substantial part of the events or omissions giving rise to the claim occurred, and in which a substantial part of property that is the subject of the action is situated.

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that this is an action in which the matter in controversy, inclusive of monetary damages and the value of injunctive relief, exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

## IV. FACTUAL BACKGROUND

### A.     Background on the Facilities.

17.     All the facilities described herein follow the design established by Murphy-Brown for hog CAFOs. The hogs are kept in densely packed, total confinement barns with slatted floors over flushing pits. Their urine and feces fall through the floor slats and stay in holding areas underneath for a period of time. They are then washed out into large, open-air cesspools, each with a capacity of millions of gallons, called "lagoons."  The waste is then pumped to a large solid set irrigation system and sprayed on the fields via a "traveler" or "traveling" spray gun.

#### i.     H&C Farm

18.     The H&C Farm facility is a CAFO with permit number AWS820709 issued by DENR. The farm is located at 1240 Cabin Museum Road in Turkey, North Carolina.  The H&C Farm facility has approximate GPS coordinates of latitude 35.011463, longitude -78.182833.

19.     The registered owner of the facility is P. Jart Hudson, however, all of the hogs are owned by Murphy-Brown. It is a "feeder to finish" facility with an allowable count of 7,040 hogs. The facility has eight hog buildings and one giant open-air lagoon that is estimated to hold 6,526,080 gallons of hog waste per year. See photo at **Exhibit 5**.

4

20. Upon information and belief, the farm's waste utilization, irrigation system, and lagoon was designed by employees of Murphy-Brown.

21. Upon information and belief, H&C Farm began production in 1994 and, for all pertinent times, is and has been a "contract grower" exclusively for Murphy-Brown or its predecessors including Carroll's Foods, Inc.

22. When Plaintiffs such as Mr. and Mrs. Atkinson first lived in the area, the H&C site was not there. However, after the Plaintiffs were already living in the neighborhood, the giant hog farm was built. See photos at **Exhibits 6 and 7**, showing the neighborhood to the southwest of the Atkinsons in 1993 (no site) and 2012 (site added).

23. Upon information and belief, Defendant has intervened in the past when compliance issues have arisen with regard to the facility. For example, on May 21, 1998, DENR issued H&C Farm a Notice of Recommendation for Enforcement for failing to obtain an approved animal waste management plan before animals were initially stocked on the farm. On several occasions, Defendant's employees spoke on the phone and wrote letters to DENR representatives offering explanations for the violation.

    ii. **NBH Finishers #42.**

24. The NBH Finishers #42 facility is a CAFO with permit number AWS820472 issued by DENR. The farm is located at 1183 Thomson Avenue in Turkey, North Carolina.

25. The registered owner of the facility is a contract grower, NBH Finishers 42, LLC, however, all of the hogs are owned by Murphy-Brown. The facility has three hog buildings and one open-air lagoon that holds millions of gallons of hog waste. It has an allowable count of 3,866 hogs. It is a feeder to finish facility. See overhead photo at **Exhibit 2**. Its GPS coordinates are latitude 35.035644 and longitude -78.187936.

5

26. Upon information and belief, the farm's waste utilization, irrigation system, and lagoon was designed by employees of Murphy-Brown.

27. Upon information and belief, NBH Finishers for all pertinent times has been a "contract grower" exclusively for Murphy-Brown or its predecessors including Carroll's Foods, Inc.

### iii. **William S. Matthews Farm**

28. The William S. Matthews Farm facility is a CAFO with permit number AWS820384 issued by DENR. The farm is located at 235 Billy Matthews Lane in Turkey, North Carolina. The facility has approximate GPS coordinates of latitude 35.0375, longitude -78.1631.

29. The registered owner of the facility is WS Matthews Farms, Inc., however, all of the hogs are owned by Murphy-Brown. It is a "feeder to finish" facility with an allowable count of 1,500 hogs. The facility has two hog buildings and one open-air lagoon that holds millions of gallons of hog waste. See photo at **Exhibit 3**.

30. Upon information and belief, the farm's waste utilization, irrigation system, and lagoon was designed by employees of Murphy-Brown.

31. Upon information and belief, the site at all pertinent times has been a "contract grower" exclusively for Murphy-Brown or its predecessors including Carroll's Foods, Inc.

### B. **Background Regarding the Plaintiffs.**

32. Many of the Plaintiffs in this case are African-Americans whose roots in the area can be traced sometimes back to Reconstruction or even earlier. These African-American rural communities were here long before Murphy-Brown and the CAFOs. Further, many in these minority communities are low-income and live in homes or mobile homes ill-equipped to combat the foul smells and other recurring nuisances from Defendant's hogs. When the thousands of

6

hogs were first trucked in, Defendant and its predecessors were well aware they were putting the hogs in minority and low-income communities especially vulnerable to the nuisance.

33.    Members of low-income rural communities traditionally have engaged in activities like hanging out their clothes to dry to save utility and appliance costs.  They often tend gardens in their yards for extra food.  Running a fan or opening the windows can save air conditioning costs.  The hog nuisance gets in the way of all these activities.  Also, extended families of related relatives often live in the same neighborhood.  They like to walk over to each other's homes and socialize and have cookouts together or sit on the porch together.  The hog nuisance interferes with these activities as well.

34.    The nuisance from the trucks is a serious nuisance in itself.  On information and belief, the inside of the transport trucks is often crowded and dirty.  The trucks inside can become smeared with raw feces and urine and stench from the hot crowded hogs.  Attached as **Exhibit 3** is a photo taken of the inside of a Murphy-Brown hog truck which shows how bad the conditions can get.  The odor and waste spilled from the trucks cause episodes of nuisance.

35.    Defendant never asks for the Plaintiffs' permission before bringing new loads of hogs into the neighborhood or allowing spraying of waste in the air which creates vapor.   Nor did Defendant or its predecessors ask for Plaintiffs' permission before siting the CAFOs or their sprayfields or cesspools.  To the contrary, Defendant and its predecessors went out of their way to guide the set-up of the CAFOs.  In fact on information and belief, from time to time Murphy-Brown or its predecessors have facilitated loans for the construction of a CAFO, or have provided materials to construct facilities and dig lagoons at no cost to the grower.

36.    On information and belief, for one or more CAFOs, Murphy-Brown and its predecessors have helped pick the site, have come over and staked off the lot to have the hog

7

houses and lagoons built, and have even paid for the materials to build the lagoons and hog houses. Yet, Murphy-Brown would not pay for lagoon covers, bioreactor systems to add odor-eating bacteria, biofilters on the shed fans, Aerway systems to avoid waste spray in the air, digester systems, nitrification/denitrification systems, solids separation systems, feed additives or modifications, barn floor scrapers or other such controls. Murphy-Brown technicians, veterinarians, truckers and site representatives come by the sites on a regular basis and micromanage the growers and Murphy-Brown checks as often as every week on lagoon levels and spray events but Defendants never warns the neighbors or gets their consent.

i. **Brenda and James Atkinson and their Family.**

37. **Brenda Atkinson** and her husband **James Atkinson** reside at 7235 Old Warsaw Road with Brenda's mother **Anna Morrisey,** their daughter **Salisa Best,** and their two grandchildren. Ms. Morrisey purchased the property in or about 1973. Ms. Atkinson has lived in the home since this time and Mr. Atkinson moved to the residence after they got married.

38. Mr. and Mrs. Atkinson live close to H&C Farm, which started in 1994. The facility and its open-air lagoon are approximately 1200 yards or 0.7 mile from their property. The spray fields used to dispose of millions of gallons of hog waste every year are much closer to their home. They also reside within about 1.3 miles of two other sites -- NBH Finishers, and the William S. Matthews facility. See **Exhibit 1**, reflecting the distances.

39. The dreadful odor and flies produced by Defendant's swine periodically affect their use and enjoyment of the property. It has frequently prevented the Atkinsons from cooking out or spending time outside in the yard with their grandchildren.

8

40. Mr. and Mrs. Atkinson have had to buy deodorizing spray, candles, or other products to try to reduce the foul odor. Although they are on well water, they only drink filtered and bottled water due to the smell and fear of contamination.

41. The Atkinsons also deal with hog trucks driving by on a frequent basis due to the dense population of Defendant's swine located in their area.

42. Over the last several years, each of the Atkinsons has suffered repeated episodes of foul and nauseating odors from the nearby hogs and their waste. These odors have been strong and foul and not just a petty annoyance. At times the odors have been unbearable.

43. Over the last several years, each of the Atkinsons has been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property. It has unreasonably interfered with their use and enjoyment of the property because they must smell a nauseating smell while engaging in normal activities on the property.

44. The foul odor has affected their use and enjoyment of the land by limiting their ability to enjoy time in activities outdoors.

45. The odors and nuisance have also decreased the value of their home.

### ii. Katie Morrisey Brunson.

46. **Katie Brunson** is 63 years old and resides at 7930 Old Warsaw Road in Turkey. Ms. Brunson moved to her current property in or about 1971. Several farms that raise thousands of swine for Murphy-Brown surround her home; the closest facility is H&C Farm.

47. Ms. Brunson's ability to use and enjoy her family land has been impaired by the periodic odors, stench, flies, and other nuisance produced by Defendant's hogs. The stench is particularly bad during warm summer days or when manure is applied to the spray fields.

9

48.     Defendant's hog trucks pass by her house on a frequent basis, leaving a trail of odor and, at times, effluent on the road.

49.     Over the last several years, Ms. Brunson has suffered repeated episodes of foul and nauseating odors from the nearby hogs and their waste.  These odors have been strong and foul and not just a petty annoyance.  At times the odors have been unbearable.

50.     Over the last several years, Ms. Brunson has been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property.  It has unreasonably interfered with her use and enjoyment of the property because she must smell a nauseating smell while engaging in normal activities on the property.

51.     The odor and flies haven interrupted family gatherings in the past. It has also prevented her from being outside in her yard on nice days. Ms. Brunson has asthma and her symptoms are often exacerbated when the odor is present. She is forced to stay indoors and keep her windows closed.

52.     Ms. Brunson keeps fly bait out year around due to the swarms of flies that invade her property. She is also forced to purchase deodorizing spray and scented candles to mask the swine odor when it gets in her home.

53.     The foul odor has affected her use and enjoyment of the land by limiting her ability to enjoy time in activities outdoors.

54.     The odors and nuisance have also decreased the value of the home.

   **iii.     Glenn Faison.**

55.   **Glenn Faison** resides at 7161 Old Warsaw Road in Turkey. Mr. Faison inherited the property from his father and has lived here since approximately 1987. Mr. Faison's home is

surrounded by several swine farms that raise thousands of hogs for Murphy-Brown. The closest facility to their home is H&C Farm.

56.     The odors and flies have negatively affected his life. At times the odor is unbearable and is worse on warm summer days or when hog manure is sprayed on the fields, including in a field only a couple hundred yards from their home.

57.     Similar to other Plaintiffs living on Old Warsaw Road, Defendant's hog trucks pass by his home on a frequent basis, leaving a trail of odor and, at times, effluent on the road.

58.     Before Defendant started putting thousands of swine near his home, Mr. Faison did not have to worry about periodic episodes of the flies and odor forcing them to stay inside. These nuisances have significantly impacted his ability to enjoy their property.

59.     Over the last several years, Mr. Faison has suffered repeated episodes of foul and nauseating odors from the nearby hogs and their waste.  These odors have been strong and foul and not just a petty annoyance.  At times the odors have been unbearable.

60.     The odor and flies have disrupted cookouts and prevented him from eating outside. Mr. Faison has been forced to stay inside with his windows closed and run his air conditioning. He is forced to purchase scented candles and deodorizing sprays to mask the odors.

61.     Similar to other Plaintiffs living on Old Warsaw Road, Defendant's hog trucks pass by his home on a frequent basis, leaving a trail of odor and, at times, effluent on the road.

62.     Over the last several years, he has been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property.  It has unreasonably interfered with his use and enjoyment of the property because he must smell a nauseating smell while engaging in normal activities on the property.

11

63.     The foul odor has affected Mr. Faison's use and enjoyment of the land by limiting his ability to enjoy time in activities outdoors.

64.     The odors and nuisance have also decreased the value of the home.

###     iv.     Elaine Faison Hunt.

65.     **Elaine Faison Hunt** resides at 7171 Old Warsaw Road in Turkey. Ms. Hunt has lived on the family property since 1984. Her home is approximately 1300 yards from H&C Farms and even closer to their spray field.

66.     The bad odors produced by Defendant's hogs impair her ability to use and enjoy her property. The smell can be worse when hog waste is applied to the spray fields.

67.      Defendant's trucks frequently drive by her home carrying hogs. She has had to purchase products to purify the air in her home, such as scented candles and de-odorizing spray. At times, she has to keep her windows and doors closed and cannot enjoy the outdoors.

68.     Over the last several years, Ms. Hunt has suffered repeated episodes of foul and nauseating odors from the nearby hogs and their waste.  These odors have been strong and foul and not just a petty annoyance.  At times the odors have been unbearable.

69.     Over the last several years, Ms. Hunt has been harmed by the episodes of foul stench. The odor itself has been ugly and unpleasant and nauseating and unenjoyable to smell on the property.  It has unreasonably interfered with her use and enjoyment of the property because she must smell a nauseating smell while engaging in normal activities on the property.

70.     The foul odor has affected her use and enjoyment of the land by limiting her ability to enjoy time in activities outdoors.   The odor and flies have disrupted cookouts and limited family gatherings. When the odor is bad Ms. Hunt is forced to stay inside with her

12

windows closed and run air conditioning. She is forced to purchase deodorizing sprays to mask the odor and medication to relieve the headaches caused by the swine waste.

71.     The foul odor has affected her use and enjoyment of the land by limiting her ability to enjoy time in activities outdoors.   It has also decreased the value of her home.

**C.      Background on Hog Manure and Odors.**

72.     Hogs generate multiple times more feces and urine per day than humans.   The General Accounting Office has estimated that 7.5 million hogs in five eastern NC counties produce 15.5 million tons of manure each year.

73.     Murphy-Brown's diet and antibiotic regimen is meant to promote aggressive growth, causing more manure to be generated in less time.

74.     A hog may grow from birth to 250 pounds in about six months or less before it is slaughtered.   A piglet usually feeds from its mother until it is three to four weeks old and weighs about 10 to 15 pounds.   Then its diet is transitioned to feed grain over the next few weeks until it is about 9 weeks old and weighs 40 to 60 pounds.   Then it is known as a feeder pig.   It takes about six months altogether for a pig to reach market weight of over 250 pounds.   A slaughter-weight hog is thus about fifty percent heavier than an average person.

75.     The hog odors can be smelled at extremely low concentrations that cannot be measured with available instruments.   The odors are released from the hog sheds, the open-air lagoons, and the spray fields.

76.     Dietary manipulation can reduce odor.   Murphy-Brown supplies all the feed and sets the ingredients and additives for its hogs and on information and belief has tailored the diet without regard to reducing the odor and nuisance.

**D.      Other Causes of Nuisance From Flies, Buzzards, Trucks, Dead Boxes.**

13

77.     In addition to and separate from any foul odors, the presence of Defendant's hogs causes periodic swarms of flies and other insects and pests.  Plaintiffs find that flies periodically come onto their properties.  These flies were not prevalent before the thousands of hogs came.  The flies impair cookouts and other outdoor activities.  Other insects such as gnats also come onto their properties.  The flies get stuck to windows and get inside homes.  They land on skin and food and are disgusting and humiliating when visitors are at the Plaintiffs' homes.

78.     These insects and pests are also scientifically found to be vectors for disease.  Flies, for example, can carry germs.

79.     In addition, ever since the hogs have come, very large trucks crawl up and down the streets.  These streets are not wide city thoroughfares distanced from the houses, but relatively narrow country roads.  The trucks at periodic times cause noise, dust, and lights from headlights, and they pass even in the middle of the night.  Further, when the trucks bring hogs in and out this can create extra odor.  And, when the "dead trucks" come for dead hogs, they can create additional foul odor as well as dripping foul substances.  These trucks are the opposite of what one would expect to see in a rural country neighborhood.

80.     Dead hogs themselves are a nuisance. Animals in confinement under high-density circumstances present a ready climate for disease.  Many swine facilities have used vaccines and antibiotics not only to promote growth but also to counteract the health effects of crowded conditions.  But the crowded often hot conditions still lead to significant mortality rates.  The pigs are susceptible to infection, microbes, parasites, and fungi.

81.     The mortality rates from the CAFOs as well as periodic epidemics of diseases such as Porcine Epidemic Diarrhea Virus (PEDV) result dead hogs placed in "dead boxes."

These dumpsters full of dead animals mean that neighbors see rotting animal corpses in their neighborhoods. They are unsightly and attract buzzards, flies, and vermin.

### E. **Murphy-Brown's Control Over its Hogs.**

82.     Defendant is a large and sophisticated company that precisely monitors the activities occurring at the facilities holding its hogs. Defendant through standardized procedures and equipment monitors the number of hogs at each site, the amount of feed used, the growth rate, the amount of feces and urine going into the cesspools, and the "freeboard", *i.e.*, the distance between the surface of the cesspool and the top of the earthen rim surrounding it.

83.     Defendant has publicized in the past how it exercises detailed control over the operations of the facilities that hold its hogs. Technical consultants and other employees of Murphy-Brown are copied on DENR correspondence regarding the facilities.

84.     Defendant uses trucks to haul its hogs from one site to another depending on what is most efficient and profitable for Defendant. Defendant has also used tanker trucks to haul manure and flush water from one lagoon to another at different sites for reasons including when the volume that is being generated threatens to flood a lagoon.

85.     Murphy-Brown was formed in 2000 from an acquisition by Smithfield of companies owned by Wendell Murphy, Sr. (the founder of the business), the Murphy family, and Murphy businesses including Murphy Family Farms (collectively "Murphy"), as well as Brown's of Carolina. Mr. Murphy is credited with adopting the CAFO design of mechanized farms that had first been invented for poultry farms in other states. However, hogs generate a great deal of manure, and North Carolina is more densely populated than many other states.

86.     Murphy required growers to invest in CAFO equipment if they wanted to hold Murphy hogs. Murphy-Brown and its predecessors helped to select CAFO sites and arrange for

financing, sometimes directly supplied or paid for materials and equipment, directly owned many sites themselves, and increased the number of hogs until counties like Duplin and Sampson became the most densely-packed in the entire United States.

87. The close confinement of hogs means epidemics can spread through hog populations and diseases, such as PEDV, have led to "PED" signs outside many of the facility gates and at roadsides at various times.

88. Recognizing the unsustainable and injurious nature of the "lagoon and sprayfield" system, North Carolina banned further construction of CAFOs that use the design in 1997. This ban was re-enacted in 2007 and remains in effect today. Under this "moratorium," hog producers are free to build new facilities so long as among other things, they will not cause odor to cross onto neighboring land. Upon information and belief, no new CAFOs have been built using the lagoon and sprayfield design in an admission of their nuisance-causing nature.

89. The 1997 moratorium was enacted only after CAFO construction began to threaten the Pinehurst golf course. The bill was sponsored by North Carolina State House Representative Richard Morgan who stated he filed the bill because he was "worried about industrial-style hog farms cropping up near golf courses in Moore County" and stated his aim was to "draw a distinction between farming and the mass production of swine."

90. Under the Murphy CAFO design, hogs step, sit, and lie on the raw manure; it gets on their bodies, which are closely packed in the sheds. The hogs squish and push it down through the slats in the floor. It drips into a holding pond below the floor where it sits like an unflushed toilet. Large fans at the ends of the sheds ventilate to keep the hogs from suffocating. The hogs create dust that dries and turns into floating particles, and smells from the feces and urine goes into the air and is blown out by the fans.

16

91.     After manure collects under the slatted floors, it gets flushed or drained out through pipes into the nearby open-air, uncovered, artificial cesspool filled with millions of gallons of hog urine and feces and flush water.  Because the cesspool is uncovered, it is free to evaporate bad odors into the air.

92.     The manure is spread on nearby fields.  Often this is done by a "traveling-gun" system in which liquid is sprayed up into the air, and mist can drift off.  Other times, a "center-pivot" system is used, which ejects it into the air by means of pressurized spraying.  The use of subsurface injection - or "knifing" the effluent into the ground - can help lower odor.  Yet on information and belief, Defendant does not facilitate such controls at most sites.

93.     In 2000, due to widespread concerns about pig farm odor, North Carolina commissioned a multi-year study known as the "Smithfield Agreement."  This agreement allocated funds for research into superior alternatives to the lagoon and spray-field system.  Various candidate technologies were reviewed for feasibility.  In 2003, under the Agreement, the non-partisan RTI institute issued a report regarding the nuisance and other bad impacts of the lagoon-and-sprayfield CAFOs.  The report found, among other things, that the sites have a negative impact on "measures of human well-being." It found:  "Odor emissions from hog farms are a continuing concern in North Carolina, particularly for residents living in close proximity to farms."  It noted how "using data on housing prices in nine counties in southeastern North Carolina … found that proximity to hog farms had a significantly negative impact on housing values and that these effects varied by the size of the operation."  Finally it noted "disease-transmitting vectors."

94.     In December 2005, a majority of the ten members of the economics subcommittee under the Smithfield Agreement found that "the range of benefits predicted to flow" from new

17

technology appeared to justify increased costs. By contrast, a minority of the members insisted that any new technology that "raises the net cost of production in North Carolina is not economically feasible." The minority report was signed by Bart Ellis of Smithfield Foods, Inc., Dave Townsend of Premium Standard Farms (acquired by Smithfield), Bundy Lane of Frontline Farmers (a group supported by Murphy), Richard Eason, President, Cape Fear Farm Credit (a company that upon information and belief benefited from CAFO construction loans set up by Smithfield), and Dennis Dipietre, Economic Advisor, Premium Standard Farms (later acquired by Smithfield). Because of the staunch opposition of these Smithfield-aligned representatives, the Smithfield Agreement ultimately failed to lead to the adoption of new control technologies for the swine CAFOs in North Carolina.

95. The growers must follow the orders and rules from Murphy-Brown or risk losing the hogs, which they never own. The 2012 annual report describes how "All company-owned and contract farms are subject to random third-party audits and site assessments" and how "Members of our production management staff … visit every contract and company-owned farm at least once a month." Murphy-Brown constantly sends specialists to the sites such as engineers, technicians, inspectors, and veterinarians, and it controls relevant details of operation.

96. As of 1995, it was reported that a typical contract grower borrowed anywhere from $200,000 to $1 million to construct hog sheds. Murphy specified the CAFO design and equipment. Murphy financed or facilitated the financing for many growers. While the grower carried the debt for a multi-year loan term, under the form contracts, Murphy could pull its hogs out at any time for a variety of reasons. The CAFOs are "single use" facilities designed for raising hogs and no other purpose. Wendell Murphy, Sr. described the situation with words to the effect of "once you pour the concrete, you are committed."

18

97.     Over the years Murphy has required some or all growers to accept terms under which if a grower fell into some lower percentage of all the growers on various metrics, such as the lowest 25%, Murphy could cancel the contract. These provisions incentivize the contract growers to work to maximize growth of the hogs at the expense of all other considerations. Meanwhile, at all times Murphy-Brown still owns the hogs. This system sometimes known as the "tournament" system pits contract growers against each other to cut costs and raise productivity above all other considerations.  The system is palpably unreasonable as there will always be a bottom fourth of growers even if they all perform well.  On information and belief, the metrics Defendant uses to rank the growers do not include such things as, whether the odors, flies and fumes are harming the neighbors.  Defendant during the pertinent times has known that its "tournament" system and other aspects of its management of the growers, the feed and the hogs causes the nuisance to increase.

98.     Murphy has admitted the control it has over the hog CAFOs and its direct involvement in the swine sites.  In 2011, Wendell Murphy, Sr. described that "The typical livestock or poultry agreement is that the farmer or contract producer provide the facilities and labor, but in this case, to enhance the idea, to cause more people to come forward, we agreed to supply their materials...the fence and the posts, the feeders, everything."  However, in grower bankruptcy proceedings, Murphy-Brown contended it had no duty to keep pigs at the site if it wanted to remove them.  These facts further evidence Defendant's control.

99.     Murphy-Brown owns the hogs at as many as two-thirds of all North Carolina sites.  DENR records confirm Defendant's control over the hogs and the odors and nuisance that they cause.  On multiple occasions, when a grower has encountered problems, Murphy-Brown

has intervened to contest any efforts by DENR to impose fines or require changes, and has closely controlled and supervised any corrections.

100. As of 2013, Murphy-Brown touted it had 5,000 employees, operations in 13 states, and over $3 billion in sales in 2013. Smithfield/Murphy-Brown produced approximately 16 million hogs in the U.S. in the 2013 Fiscal Year. In the nine months ending on September 30, 2013, Smithfield produced nearly twice the number of hogs produced by the next largest U.S. competitor. Murphy-Brown dominates the North Carolina hog industry.

101. Murphy-Brown is a multi-state corporation, wholly-owned by an even larger multinational corporation which itself is owned by a Chinese-controlled enterprise (formerly Shuanghui, now WH Group) after an acquisition valued at more than $7 billion. Murphy-Brown is part of one "integrated" enterprise, in which Shuanghui/WH Group own Smithfield, which owns the hogs through Murphy-Brown, owns the processing plants through its Smithfield Packing subsidiary, and controls other aspects of the pork production process. The relationship between Murphy-Brown and its contract growers is part of "vertical integration" in which Murphy-Brown is the "integrator."

102. Shuanghui Group is a meat processing company headquartered in Luohe, Henan, China and the largest meat producer in China. Shuanghui/WH Group acquired Smithfield and Murphy-Brown pursuant to a Chinese government five-year plan to increase food resources and imports. The growing Chinese middle class is growing exponentially with its demand for pork. Shuanghui, Smithfield and Murphy-Brown management have all said that a primary purpose of the acquisition and a primary current goal of the enterprise at this time is to increase production and increase exports to China.

103.     The increase in production and exports has already begun.  On information and belief, local growers have been told to increase production at their farms in North Carolina. Smithfield pork grown by Murphy-Brown farms is already being sold at meat counters in China. The increase in hog production increases the nuisance because it increases the amount of waste, the amount of odor and fumes and other aspects of the nuisance.

104.     The Chinese market for pork is growing while the U.S. market for pork declines. The social utility of the Murphy-Brown enterprise in North Carolina is increasingly to use North Carolina hog production to supply the export market to China and Chinese consumers.  These increased exports are leading to record revenues and profits for Defendant and its parent companies.  Accordingly Defendant has the resources and the ability to feasibly compensate affected neighbors and correct the nuisance.

105.     Hogs actually cost less money to produce in the U.S. than in China.  One reason for this is because Defendant refuses to take adequate measures to control the pollution and nuisance from the hogs or to support local North Carolina growers so that they may do the same. Meanwhile, Defendant's ultimate parent company, WH Group, touts on its website that it uses special measures at its facilities in China to treat the waste and to limit the odor and nuisance. These measures are not used in North Carolina.

**F.     Evidence of Negligent, Willful and Wanton Conduct.**

106.     Murphy-Brown and its predecessors, in placing tens of thousands of hogs at the facilities, acted negligently and in willful disregard to the harm known to be caused by the hogs. Over the years, Defendant has continued to cause its hogs to create nuisance and injury without taking action to end the nuisance despite repeated episodes of damage and mounting scientific research verifying the harm suffered by the Plaintiffs.

107. Defendant's marketing and investor materials repeatedly tout Defendant as taking action to protect the environment. The 2012 Smithfield annual report claims that "Murphy-Brown is committed to … protecting the environment…" The studies, reports, incidents and complaints that have amassed since Murphy first started the CAFO system clearly show predictable nuisance caused by swine sites to nearby neighbors. However, Defendant has not stopped the nuisance, though many neighbors sent nuisance mediation demands over a year ago. Defendant chose to summarily waive mediation.

108. From the early 1990s to present, due chiefly to Defendant and its predecessors' efforts, hog production greatly expanded and CAFOs were placed near community members like Plaintiffs. Production in North Carolina tripled between 1990 and 1995, growing from 5 million hogs produced in 1990 to 15 million in 1995. The hogs at the subject facilities were part of this rapid expansion. Multiple spills, lagoon breaches, episodes of odor and harm have occurred. Numerous reports have confirmed the injury suffered by community members. The Legislature has banned any new CAFOs using the Defendant's old system due to the indisputable evidence of harm and damage to neighbors.

109. Defendant and its predecessors have acted improperly during prior incidents caused by the CAFOs. As an example, on May 8, 1991, a 10-acre feces and urine cesspool ruptured on Murphy's Magnolia No. 1 facility in Duplin County. After the lagoon collapsed, tons of water flowed into Millers Creek. According to news reports, Wendell Murphy, Sr. knew about the incident within hours and personally visited the site. It took four days to find and patch the leak. But Murphy never notified the State about the spill.

110. Mr. Murphy in a news article dated February 19, 1995 stated there was "not one shred, not one piece of evidence anywhere in this nation" that hog lagoons were harming the

22

groundwater."   In fact, hog CAFOs do harm the groundwater.  Studies have reviewed lagoons in the coastal plain of North Carolina and found seepage losses to the surficial aquifer.

111.   Mr. Murphy, as reported on February 24, 1995, represented that CAFOs increased property values:  "Wendell Murphy, founder and chairman of Murphy Family Farms, rejects claims that hog farms devalue nearby property. In fact, he says the opposite is true: 'Property values have gone up, and I mean seriously gone up, as a result of this industry being here.' … 'If somebody has property near us and they say their property is worth less and they have to leave -- tell us about it. We'll buy it.'"  Those statements were inaccurate.  Numerous studies have shown that swine sites hurt property values.  According to subsequent news reports, when one or more CAFO neighbors later sought to take Mr. Murphy up on his offer to buy their properties, Mr. Murphy backed out and refused to do so.

112.   In August of 1997, Smithfield was fined $12.6 million for violating the U.S. Clean Water Act.  This was reported to be the largest fine ever imposed under the Clean Water Act. Smithfield was found to be dumping into the Pagan River, a tributary flowing into the Chesapeake Bay.  The company's failures resulted in more than 5,000 violations of permit limits over five years.  These violations caused harm to the water quality of the Pagan River, the James River, and the Chesapeake Bay. Further, the Courts found that the company had falsified documents and destroyed water quality records.

113.   In April 1999, a spill at Vestal Farms, owned by Murphy, dumped over a million gallons of water in Duplin County.  Murphy and the North Carolina Pork Council claimed the spill was caused by vandals.  The State found zero evidence to support Murphy's claim.  In fact there was vegetation growing near the lagoon, tree roots weakening the wall, and erosion. Murphy had been warned to clear the trees. The State concluded that excessive seepage through

the dike wall was the probable cause. Nearly two million gallons spilled into a tributary of the Northeast Cape Fear River. Murphy was fined $40,650.

114.   In September 1999, Hurricane Floyd caused flooding in Eastern North Carolina. Many hog farms flooded and thousands of dead pigs floated to nearby areas. This hurricane and other rain events have caused flooding from hog facilities and highlighted the vulnerabilities in our State. However in 2011, Wendell Murphy, Sr. stated the harm caused by the hog facilities in the hurricane was "minimal."

115.   Murphy has added special controls at sites in other states and admitted that it was to "reduce the level of odor produced by the farms." Defendant has added controls at some sites in North Carolina such as the Mitchell Norris facility in Bladen County due to odor and has installed a partial lagoon cover at Kenansville Farm in Duplin County "to respond to odor complaints from neighbors." Defendant however willfully refuses to install improvements at the vast majority of sites where its hogs are stored.

116.   In contrast to Defendant's assertions that its hogs do not cause nuisance or injury, numerous scientific reports and studies have found that they do. These reports show that Defendant has actual knowledge of the nuisance caused by its swine, or is willfully blind to that fact. They also support the fact that the neighbors can suffer adverse effects from the odors such as nausea, congestion, wheezing and difficulty breathing, and loss of enjoyment and have reasonable fears regarding the effect of the nuisance on them and their families, including young children or grandchildren, elderly and disabled family members, and other loved ones.

117.   Because Murphy recklessly failed to perform proper studies to determine the potential harmful effects of the swine CAFOs before building them in the 1980s-early 90s, scholars were obligated to work to assess the health risks after the fact. The numerous studies

that were produced from 1995 onward document, among other things, how persons living near the swine experienced odors and reported significantly more tension, depression, anger, fatigue, and confusion; how swine were located in communities susceptible to the nuisance and likely to experience detrimental consequences; how swine odor adversely affected children; how hog nuisance impaired activities like cookouts, barbequing, family reunions, socializing with neighbors, gardening, working outside, playing, drying laundry outside, opening doors and windows for fresh air and to conserve energy, use of well water, and growing vegetables; how swine sites reduced nearby property values; and how swine waste at CAFOs contained germs, dangerous chemicals and pathogens linked to childhood asthma and other illness and disease.

118.    Defendant knew or should have known both from its own experience, from neighbor complaints, from lawsuits, governmental enforcement actions, consent orders and verdicts against it, in multiple states, and from the studies and reports, that hog urine and feces causes a nuisance to neighbors, hog emissions contain disease-causing pathogens and chemicals, and this is harmful to humans.  Defendant's ongoing failure to take reasonable steps to abate the nuisance caused by its hogs reflects willful and wanton conduct under the circumstances.  After over than 15 years of a moratorium on new construction of harmful lagoon and spray facilities, Murphy-Brown still sends its hogs to such facilities under a one-sided contract grower system designed to maximize integrator profit without abating the nuisance.

**COUNT I: RECURRING, TEMPORARY, ABATABLE,
PRIVATE NUISANCE**

119.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

25

120.     Plaintiffs, and each of them, are, or during some or all of the pertinent times were, in lawful possession of their properties, and used them, or had the right to use them, as residences or for other legitimate uses.

121.     Defendant, during the pertinent times, owned and materially controlled the hogs in close proximity to Plaintiffs' properties so as to cause a private nuisance.

122.     Plaintiffs' right to use and enjoy their properties has been impaired by recurring foul and offensive odors; hog manure and urine; flies or other insects; buzzards or other scavenger animals; vectors of disease; trucks that cause noise and lights at night and foul smells; dead hogs; and other sources of nuisance.

123.     The nuisance periodically caused by Defendant's swine has substantially impaired Plaintiffs' and use and enjoyment of their property, and has caused anger, embarrassment, discomfort, annoyance, inconvenience, decreased quality of life, deprivation of opportunity to continue to develop properties, injury to and diminished value of properties, physical and mental discomfort, and reasonable fear of disease and adverse health effects.

124.     Defendant has engaged in improper or negligent operation of swine sites during some or all of the pertinent times, causing harm to the Plaintiffs.

125.     Defendant's conduct has been unreasonable.   Reasonable persons, generally, looking at Defendant's conduct, the problems caused by it, the character of the neighborhood, the nature, utility and social value of the use of land, and the extent, nature, and recurrent nature of the harm to Plaintiffs' interests, would consider Defendant's conduct to be unreasonable.

126.     The invasions, harms and injuries complained of herein by Plaintiffs are more than slight inconveniences or petty annoyances, but rather substantial invasions, harms, and injuries to Plaintiffs' comfort, property, and use of their land.

127.    Defendant had actual knowledge during some or all of the pertinent times that the subject hogs were causing a nuisance.

128.    Defendant knew or should have known that foul and offensive odors, hog manure and urine, flies and other insects, and other causes of nuisance from their hogs would recurrently encroach upon and invade Plaintiffs' properties, and substantially impair Plaintiffs' use and enjoyment of their properties.

129.    While knowing that practicable technologies and methods are readily available to abate the nuisances and problems, Defendant has failed to abate the foul and offensive odors and other causes of nuisance.

130.    During the pertinent times, the level of control that Defendant exercised over relevant aspects of the hogs and facility operations rose to such a level that Defendant stood in a principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facility in a manner which caused a nuisance to the Plaintiffs.

131.    Alternatively, during the pertinent times, Defendant's own direct involvement in material aspects of the operation of the facilities and management of the hogs renders Defendant independently liable for the nuisance with regard to the Plaintiffs.

132.    Alternatively, during the pertinent times, Defendant employed contract growers to do work which Defendant knew or had reason to know would likely involve the creation of a nuisance, and is therefore subject to liability for harm resulting to Plaintiffs.  *See* Restatement (Second) Torts § 427B ("One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another or the creation of a public or a private nuisance, is subject to liability for harm resulting to others from such trespass or nuisance.").

27

133. Defendant's conduct described above constitutes a series of recurring temporary abatable private nuisances, which Defendant has failed to remedy within a reasonable period of time, and for which Defendant is liable.

134. As a result of Defendant's liability for private temporary recurring abatable nuisance, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

135. In accordance with Fed. R. Civ. P. 9(g), Plaintiffs hereby plead special damages including the diminished value and lost rental value of their homesteads and properties. Plaintiffs show that as homeowners and occupants of their family properties, they are of the opinion that one impact of Defendant's nuisance has been to reduce their property values. Numerous studies and reports have determined that hog CAFOs lower nearby property values. Plaintiffs allege that each of their homes and properties has lost significant value as a result of the proximity of Defendant's hogs and the stench and nuisance that they cause, to be shown at trial. These damages are in addition to all other allowable damages which the jury may award.

## COUNT II: NEGLIGENCE

136. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

137. At all pertinent times, Defendant had a duty of reasonable care as to the ownership, maintenance, and control of the hogs that it recurrently sent in groups to swine facilities.

138. During the pertinent times, the level of control that Defendant exercised over relevant aspects of the hogs and facility operations rose to such a level that Defendant stood in a principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facilities in a negligent manner which caused injury to the Plaintiffs.

28

139. Alternatively, during the pertinent times, Defendant's direct involvement in material aspects of the operation of facilities and the management of the hogs renders Defendant independently liable for its breaches of its duty of due care with regard to the Plaintiffs.

140. Defendant has recurrently breached its duty of due care each time it has sent new large groups of its hogs to the CAFOs. As a direct and proximate result of Defendant's breach of its duty of care, the Plaintiffs have been injured.

141. During the pertinent times, Defendant knew or should have known that its actions and omissions were causing and contributing to cause harm to the Plaintiffs.

142. Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate Plaintiffs for the negligence of Defendant.

## COUNT III: PUNITIVE DAMAGES

143. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

144. Defendant's above-described recurring conduct, acts, omissions, negligence, and impropriety included aggravating factors giving rise to a claim of punitive damages under Chapter 1D of the North Carolina General Statutes.

145. Pursuant to N.C. Gen. Stat. § 1D-15(a), Defendant is properly liable for punitive damages in this action in that Defendant is liable for compensatory damages and has committed one or more aggravating acts or omissions justifying an award of punitive damages, including without limitation, recurring acts of egregious and reckless behavior, and specific instances of willful and wanton conduct.

146. The recurring conduct, acts, omissions, negligence, and impropriety of the Defendant were willful, wanton, malicious, and in reckless disregard for the rights and interests

of the Plaintiffs and justify an award of punitive damages.  Accordingly, Plaintiffs demand judgment against Defendant for punitive damages in an amount to be determined at trial.

## COUNT IV: INJUNCTIVE AND EQUITABLE RELIEF

147.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

148.    In addition to their claims for monetary damages, the Plaintiffs respectfully request entry of injunctive and equitable relief requiring the Defendant to implement and continue measures to alleviate and abate the nuisance-causing conditions alleged herein.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court:

A.    Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B.    Award the Plaintiffs punitive damages;

C.    Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses or fees to which they may be entitled by law;

D.    Award the Plaintiffs appropriate injunctive and equitable relief; and

E.    Award the Plaintiffs such other and further relief as is just and proper.

A JURY IS RESPECTFULLY DEMANDED TO TRY THESE ISSUES.


Respectfully submitted, this the _____ day of _____, 2015.

By:     s/Mona Lisa Wallace
             Mona Lisa Wallace
             NCSB #9021
             John Hughes
             NCSB #22126
             Wallace & Graham, P.A.
             525 North Main Street
             Salisbury, NC  28144
             Phone: 704-633-5244
             Fax: 704-633-9434
             mwallace@wallacegraham.com
             jhughes@wallacegraham.com

**CERTIFICATE OF SERVICE**

I do hereby certify that on the ____ day of _____, 2015, I filed a true and correct copy of the above and foregoing **COMPLAINT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing (NEF) to all CM/ECF registered attorneys indicated on the NEF, including counsel for Defendant.


By: s/Mona Lisa Wallace
   Mona Lisa Wallace, NCSB #9021
   John Hughes, NCSB #22126
   Wallace & Graham, P.A.
   525 North Main Street
   Salisbury, NC 28144
   Phone: 704-633-5244
   Fax: 704-633-9434
   mwallace@wallacegraham.com
   jhughes@wallacegraham.com